Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 15, 2011        Decided July 1, 2011
Reissued August 26, 2011

No. 09-7150

CHRISTOL ENGLISH, AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF JASON TAFT,
APPELLANT

v.

DISTRICT OF COLUMBIA AND KEVIN MCCONNELL,
DETECTIVE, METROPOLITAN POLICE DEPARTMENT,
IN BOTH HIS OFFICIAL AND INDIVIDUAL CAPACITIES,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01337)

---

*Gregory L. Lattimer* argued the cause and filed the briefs for appellant.

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees.  With him on the brief were *Peter J. Nickles*,

Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: A jury found for the District of Columbia government and a detective of the Metropolitan Police Department ("MPD") (together, "the government"), in this case alleging a section 1983[1] claim for the use of excessive force in violation of the Fourth Amendment and common law claims for assault and battery. Appellant, as personal representative of her brother's estate, sued to recover damages for the shooting death of her brother by the detective, and she contends on appeal that she did not receive a fair trial. The principal issue concerns the district court's rulings on the inadmissibility of portions of an internal MPD report regarding the altercation between the detective and appellant's brother. A related issue involves a violation of the pretrial disclosure requirements of Federal Rule of Civil Procedure 26.

Specifically, appellant contends that the district court's evidentiary rulings allowed the government to maintain a "contrived" defense that the detective's actions were constitutionally permissible while denying her the ability to refute it. Appellant's Br. 29. We find no abuse of discretion by the district court. The record reveals that it properly excluded those parts of the report likely to confuse the jury and unfairly prejudice the government. We conclude that the government failed to comply with Rule 26(a)(2)(E) by not supplementing the medical expert's disclosure to reflect an interview with the

---

[1] *See* 42 U.S.C. § 1983.

detective on which the expert intended to rely at trial, but that the violation was harmless and so the district court's refusal to strike the expert's testimony was not an abuse of discretion. Accordingly, because appellant's other claims of error and her bias claim are unpersuasive, we affirm.

**I.**

According to Detective Kevin McConnell's testimony at trial, late on the night of August 3, 2007 he was driving on Good Hope Road in Southeast Washington, D.C. when he observed an altercation inside a carry-out restaurant. As he pulled over to the curb, he saw a man pulling on the door separating the customer area from the kitchen. McConnell, dressed in plainclothes but displaying his badge on a chain around his neck, entered the carry-out and announced, "Police." Tr. Nov. 16, 2009 p.m., at 85. The man — who turned out to be Jason L. Taft — walked up to McConnell "aggressively," prompting McConnell to push Taft backwards. *Id.* at 86. Taft responded: "Why did you hit me, Officer?" *Id.* at 40. McConnell told him he was under arrest, after which a lengthy and violent struggle ensued during which the two men "went down to the ground several times," *id.* at 87, took turns attempting to gouge each other's eyes out, and exchanged bites. Then McConnell put Taft in a "Full Nelson" hold, from which Taft managed to break free, and Taft began to run for the door. McConnell attempted to grab him by the collar, but Taft ducked, and McConnell flipped over and hit his head on the concrete pavement. By this point — several minutes into the brawl — McConnell was "completely gassed out" and having trouble breathing. *Id.* at 88. With McConnell still on his knees, Taft approached, placed his arms around his neck, and told him, "I'm going to choke you out, motherfucker." *Id.* at 89. Taft placed the full weight of his body on McConnell's carotid arteries, restricting the flow of blood to his brain, and McConnell began to black out. As McConnell was

trying to push Taft off him, McConnell pulled out his nine millimeter service pistol and pulled the trigger. McConnell could not hear anything besides a "click," and his vision was coming and going. *Id.* He felt Taft's weight lift off him, but he thought Taft was "still there," *id.* at 90, and squeezed the trigger two more times.

An internal MPD investigation by Sergeant Scott Gutherie of the Internal Affairs Bureau Force Investigations Branch concluded that the first shot fired by Detective McConnell — in the midst of a struggle over the gun — was "not only objectively reasonable, but was also in response to an actual attack that could have resulted in the death of Detective McConnell." The report concluded, however, that the second and third shots — fired while Taft was running away — "were not fired during an actual or threatened attack," but only during a "*perceived* attack." FIT Rpt. 23-24. The report, called the Force Investigation Team Report or FIT Report, summarized findings based on review of statements by Detective McConnell and various witnesses who were present during part or all of the altercation, and the available physical evidence, electronic communications, and medical reports. Based on this review, the FIT Report concluded that at the end of an extended violent confrontation, Detective McConnell began to lose consciousness and shot Taft in the thigh. Taft — whose posthumous toxicology test revealed a bodily fluid alcohol content of 0.12 to 0.21% — then separated himself from Detective McConnell and ran toward the street, at which point Detective McConnell — still disoriented — fired two shots, one of them missing, the other striking Taft in the back. Taft later died from this second gunshot wound. Accordingly, the FIT Report concluded that the two shots, while perhaps "objectively reasonable," violated an MPD policy allowing the use of deadly force only during an "actual or threatened attack that is imminent." *Id.* at 23; *see* MPD General Order 901.07:V:D. The Use of Force Review

Board, to whom Sergeant Gutherie submitted his findings, declined to adopt them and concluded that all three shots were justified. But Inspector Dierdre Porter, the director of MPD's Disciplinary Review Branch, disagreed with the Board and wrote a referral letter to the assistant chief of MPD's Professional Development Bureau recommending the termination of Detective McConnell's employment in view of his policy violation with respect to the use of deadly force against Taft; a final decision on that recommendation was pending at the time of trial.

Prior to trial, the government moved to exclude both the FIT Report and Inspector Porter's letter. During an *in limine* hearing on the motion, the district court heard testimony from Sergeant Gutherie and Inspector Porter about the procedures and conclusions of the use of force investigation and recommendations. The district court ruled that it would not allow into evidence either the FIT Report or Inspector Porter's letter recommending Detective McConnell's termination, reasoning that the witness statement summaries would not "tell[] any different story than the evidence we're going to hear in this courtroom about exactly what happened," and because the conclusions about the policy violation were "not involved with deciding the constitutional question of the reasonableness of force." Tr. Nov. 16, 2009 a.m., at 27. The district court explained that although the FIT Report might "at some minimal level be admissible," its admission would be "hedged about with jury instructions," would likely cause confusion between the issues before the jury and those before the MPD's internal disciplinary trial board, and would result in a "trial within a trial about the whole District of Columbia disciplinary system." *Id.* at 28. Appellant could, nonetheless, seek to have parts of the FIT Report admitted into evidence if the door were opened "by some argument or some evidence that is used in the trial." *Id.*

At trial, appellant, through counsel, adduced undisputed eyewitness testimony from individuals who were in the carry-out that at least by the time Detective McConnell fired his second and third shots, Taft was moving away from him. These witnesses were also interviewed in connection with MPD's internal investigation and their statements made part of the FIT Report. Appellant also called Sergeant Gutherie to testify about his investigation. During a bench conference, the district court ruled that Detective McConnell's admissions, as recounted in the FIT Report, could be admitted in evidence, but that appellant had failed to provide a reason for admitting information relating to the factual basis for Sergeant Gutherie's findings and conclusions. Nonetheless, appellant proceeded to question Sergeant Gutherie at length about the evidence he had examined.[2]

In defense, the government called two expert witnesses. The first, Dr. Richard Restak, an expert in neuropsychiatry, testified generally about the effect of restricted oxygen flow to the brain on perceptive and cognitive functioning, aided by an in-court demonstration by Detective McConnell of the chokehold in which he claimed Taft had held him. Dr. Restak explained that in such situations, individuals are overtaken by a primitive fear of death; their sense of perception and comprehension is diminished; and their sense of hearing may also be diminished.

---

[2] When re-called by the government, Sergeant Gutherie testified about an inconsistent statement by one of appellant's witnesses regarding the number of shots fired by Detective McConnell and Taft's position relative to Detective McConnell at the time the shots were fired. Over appellant's objection, the district court initially allowed this testimony for purposes of impeachment. Upon reconsideration, the district court struck the testimony and instructed the jury not to consider it.

On direct examination, the government asked no questions, and Dr. Restak gave no opinion, specific to the facts of this case, relying only on his general expertise. On cross-examination, appellant observed that Dr. Restak had not testified to his opinion of the case-specific circumstances even though his pretrial report had provided such an opinion on the basis of his review of the FIT Report, suggesting perhaps that Dr. Restak's opinion was somehow adverse to the government's case. On re-direct, the government asked Dr. Restak for his case-specific opinion, and over appellant's objection, Dr. Restak opined that Taft's chokehold on Detective McConnell "interfered with his mentation, his cognitive functioning, and that this, just to put it into a nugget, into a sentence, is what happened." Tr. Nov. 17, 2009 p.m., at 122.

On re-cross, appellant asked Dr. Restak about the basis of his opinion. Dr. Restak responded that it was based on his review of witness statements in the FIT Report, and on his interview and examination of Detective McConnell on October 22, 2009, even though his Federal Rule of Civil Procedure 26(a)(2) expert disclosure (dated September 25, 2009) did not mention an in-person interview and examination of Detective McConnell and the notice was not supplemented by the government to reflect the October interview. Appellant questioned Dr. Restak about this discrepancy. Dr. Restak agreed that in preparing the September 25, 2009 disclosure he had relied on the FIT Report, and appellant began describing parts of the report, which Dr. Restak, following along, confirmed. The district court allowed this recitation to continue, over the government's objection, until appellant began to discuss the "discrepancies and all of those other things that are in the report" — an apparent reference to Sergeant Gutherie's factual findings and conclusions — at which point the district court sustained the government's objection. *Id.* at 130.

When appellant persisted in this line of questioning, the district court excused the jury and stated that it surmised that appellant was "trying to get [Dr. Restak] to quote the thought process of Sergeant Gutherie," and that those thought processes and opinions were "not coming into evidence." *Id.* at 133. Appellant argued that she should be allowed to use the FIT Report in its entirety to question the basis for Dr. Restak's opinion, and, further, that "his whole testimony ought to be stricken" because the required expert disclosure either was not filed or was incomplete. *Id.* at 134, 137. The district court informed appellant: "You may not make reference to the discrepancies portion of the FIT Report, you may not make reference to the opinions of Sergeant Gutherie. You may use whatever is in the report that constitutes statements of Detective McConnell about the choke hold, or of anybody else who saw the choke hold." *Id.* at 138. Thereafter, Dr. Restak, indulging a hypothetical from appellant, opined that someone who shot another person for no reason would likely be severely emotionally disturbed, although not necessarily cognitively impaired as he believed Detective McConnell had been. When the government attempted to ascertain whether Dr. Restak found Detective McConnell to be emotionally disturbed based on his interview, the district court *sua sponte* precluded this line of questioning.

The government's second expert witness was G. Patrick Gallagher, an expert in police policies and training related to the use of force and other areas. When Gallagher began discussing his work on national standards and internal affairs investigations, the district court called the parties' counsel to the bench and warned the government that Gallagher's testimony, if it continued, "is going to open the door to that FIT Report." *Id.* at 154. The government thereafter declined to ask Gallagher any more questions and he was excused as a witness.

Additionally, the government played for the jury, over appellant's objection, tape recordings of telephone calls from individuals in and near the carry-out reporting the altercation and requesting police assistance. After closing arguments, instructions, and deliberation, the jury found for the government, rejecting appellant's excessive force and assault and battery claims. Appellant appeals.

## II.

Appellant contends that the district court erred in refusing to admit into evidence in their entirety the FIT Report and Inspector Porter's letter recommending termination of Detective McConnell's employment, and thus denied her a fair trial. The trial record suggests that appellant sought to use the FIT Report's conclusion that Detective McConnell violated MPD policy when he fired his second and third shots at Taft in support of the excessive force claim. This is confirmed by appellant's brief on appeal. The district court excluded portions of the FIT Report relating to the conclusion that the detective had violated MPD policy out of concern it would cause the jury to confuse the policy violation issue — not implicated in the trial — with the separate question of whether Taft's constitutional rights were violated because McConnell's actions were objectively unreasonable under the circumstances. Appellant maintains that excluding this portion of the FIT Report prevented her from refuting the government's defense that Detective McConnell's conduct was objectively reasonable, a defense she characterizes as "unequivocally inconsistent" with the content of the FIT Report and Inspector Porter's recommendation. Appellant's Br. 31.

Our review of the district court's evidentiary rulings is for abuse of discretion. *See Whitbeck v. Vital Signs*, 159 F.3d 1369, 1372 (D.C. Cir. 1998). The district court has broad discretion in

ruling on evidentiary matters when "weigh[ing] the extent of potential prejudice against the probative force of relevant evidence." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 633 (D.C. Cir. 2010). Nonetheless, a district court's decision to exclude evidence due to the danger of unfair prejudice pursuant to Federal Rule of Evidence 403[3] that is "based on an understatement of the probative value," or a "miscalculation of the danger of unfair prejudice," is "subject to reversal." *Henderson v. George Washington Univ.*, 449 F.3d 127, 133 (D.C. Cir. 2006). Even when the district court has abused its discretion, reversal is appropriate only upon a concomitant finding that the error affected appellant's "substantial rights." *Whitbeck*, 159 F.3d at 1372 (quoting FED. R. CIV. P. 61).

First, as appellant points out, contrary to the government's position, the FIT Report and Inspector Porter's letter are non-hearsay party admissions under Federal Rule of Evidence 801(d)(2)(D).[4] It is undisputed that Sergeant Gutherie and

---

[3] Federal Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED. R. EVID. 403.

[4] Federal Rule of Evidence 801(d)(2)(D) provides that a statement is not hearsay if it is offered against a party and is:

a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]

Inspector Porter were acting within the scope of their employment by the District of Columbia government, one of the defendants in this case — at the time they prepared and submitted them. The government responds, without citation to authority, that the documents are not party admissions because the District government did not "adopt or ratify" them and the findings were not "final." Appellees' Br. 23. The plain text of Rule 801(d)(2)(D) requires neither adoption nor ratification but only that the statement is offered "against a party," FED. R. EVID. 801(d)(2), and it is "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," FED. R. EVID. 801(d)(2)(D); *see Talavera v. Shah*, 638 F.3d 303, 309-10 (D.C. Cir. 2011). Consequently, the FIT Report and the letter recommending termination of employment are District government admissions that were admissible at trial against it and Detective McConnell in his official capacity, *see Wilburn v. Robinson*, 480 F.3d 1140, 1148 (D.C. Cir. 2007).

Second, appellant is partially correct that the documents were admissible against all defendants — including Detective McConnell in his individual capacity — because they are covered by the public records exception to the hearsay exclusion. This exception provides, *inter alia*, that records, reports, or statements setting forth "factual findings resulting from an investigation made pursuant to authority granted by law" are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness." FED. R. EVID. 803(8)(C). The district court found that the FIT Report's factual basis was sufficiently reliable under Rule 803(8)(C), noting that "although it's based on double, triple hearsay and stale hearsay at that," the court was satisfied that it does not "tell any different

FED. R. EVID. 801(d)(2)(D).

story than the evidence we're going to hear in this courtroom about exactly what happened." Tr. Nov. 16, 2009 a.m., at 27. Sergeant Gutherie's report was based on his own factual investigation, and the Supreme Court has held that Rule 803(8) does not "draw some inevitably arbitrary line between the various shades of fact/opinion that invariably will be present in investigatory reports." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988). Rather, "'reports . . . setting forth . . . factual findings'" are admissible, including those portions of the reports containing opinions rather than facts. *Id.* (quoting FED. R. EVID. 803(8)(C)). Consequently, the FIT Report falls within the public records exception to the hearsay rule. Inspector Porter's letter does not, because she based her recommendation only on having "reviewed the investigative [FIT R]eport," not her own factual investigation, and Rule 803(8) "bars the admission of statements not based on factual investigation." *Id.*

The government's suggestion that the FIT Report is not a Rule 803(8) public record because it was an "'interim report subject to revision and review,'" Appellees' Br. 21, fails because the report itself was final, and whether or not its author's superiors chose to adopt it is irrelevant under Rule 803(8). There is no suggestion that Sergeant Gutherie had any intention to revise his report after he submitted it to the Use of Force Review Board. True, the review board disagreed with his finding of a MPD policy violation and concluded that Detective McConnell's use of deadly force was within MPD policy and justified. But Inspector Porter overturned this conclusion and recommended termination of Detective McConnell's employment based on the findings and conclusions in the FIT Report. The fact that the FIT Report had not been finally adopted or ratified by higher MPD authority prior to trial is irrelevant to whether it is a Rule 803(8) public record. *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1481-82 (D.C. Cir. 1991). *In re Korean Air Lines* involved the

investigation by the International Civil Aviation Organization ("ICAO") of the incident in which a civilian airliner was shot down by Soviet military aircraft. The ICAO's governing council directed the organization's Secretary General to investigate and prepare a report on the incident. 932 F.2d at 1481-82. Once the Secretary General submitted his final report, however, the governing council chose not to endorse it. What mattered, the court held, was not whether the agency chose to adopt the report, but whether the preparer was "acting in the capacity of a public official when he conducted 'an investigation made pursuant to authority granted by law.'" *Id.* at 1482 (quoting Rule 803(8)(c)). Consequently, the investigative report, even though it was not adopted by the overseeing board, was nonetheless a Rule 803(8) public record. *Id.* Likewise here, as Sergeant Gutherie was acting pursuant to his official duty and his report was sufficiently final, the FIT Report satisfies these requirements and is therefore not excluded by the hearsay rule.

The district court's *in limine* ruling excluding the FIT Report and Inspector Porter's letter was without prejudice, inviting appellant to seek to use portions of the FIT Report if the door was "opened to its use by some argument or some evidence that is used in the trial." Tr. Nov. 16, 2009 a.m., at 28. Appellant accepted that invitation and sought to get the contents of the FIT Report into evidence through questioning of Sergeant Gutherie and Dr. Restak at trial. The district court allowed appellant to use Detective McConnell's statements in the FIT Report (as party admissions) and further allowed extensive questioning of Sergeant Gutherie and Dr. Restak about the witness statements and other evidence relied on in the FIT Report. Thus, appellant elicited Sergeant Gutherie's findings that: (i) Taft was shot twice, once in the thigh and once in the back; (ii) at the time of the initial gunshot, Taft and Detective McConnell were in contact with one another; and (iii) the fatal gunshot into Taft's back occurred when Taft was between six

and fifteen feet away from McConnell.  The only part of the FIT Report that appellant was barred from introducing was the portion containing Sergeant Gutherie's conclusions that at the time Detective McConnell fired the fatal shot he was no longer under a *real* attack, but merely a *perceived* attack, and that this conduct violated MPD policy concerning the use of deadly force.

For several reasons it seems clear that the district court did not abuse its discretion in drawing this line based on its balance of the probative value of the FIT Report against the danger of confusion and unfair prejudice.  First, as the district court concluded, the excluded portions of the FIT Report — and all of Inspector Porter's letter — were of little assistance to the jury because they were cumulative of the live witness testimony to be offered, and in fact offered, at trial.  Indeed, the government never suggested during trial that Detective McConnell was under a real threat of attack at the time he fired the fatal shot.  All of the eyewitness testimony indicated that Taft was moving away from Detective McConnell when he fired the final two shots.  The government's defense, through the testimony of Detective McConnell and Dr. Restak, focused on the cognitive deficiency Detective McConnell allegedly suffered at the time of the fatal shot as a result of the chokehold by Taft.  Sergeant Gutherie's conclusion that the attack at that point was only perceived and not real was thus cumulative of the undisputed evidence at trial.

Second, Sergeant Gutherie's conclusion that Detective McConnell violated MPD policy was irrelevant to the question before the jury because although "police enforcement practices . . . vary from place to place and from time to time" the Supreme Court observed that "the . . . protections of the Fourth Amendment are [not] so variable."  *Whren v. United States*, 517 U.S. 806, 815 (1996).  Moreover, appellant appears to ignore

that admission of the FIT Report in its entirety could have undermined her section 1983 excessive force claim. The FIT Report reserves judgment on the constitutional question of whether Detective McConnell's actions were objectively reasonable "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham v. Connor*, 490 U.S. 386, 396 (1989). Indeed, the FIT Report even acknowledges that Detective McConnell's actions "might be considered objectively reasonable." FIT Rpt. 23. But the FIT Report explained that the MPD holds its officers to a higher standard than that required by the Constitution: in addition to being objectively reasonable at the time, an officer's use of deadly force must be in response to "an actual or threatened attack that is imminent and could result in death or serious bodily injury." *Id.* at 24 (quoting MPD General Order 901.07:V:D:1). So, even if a reasonable officer in Detective McConnell's position at the time would have felt compelled to use deadly force, the officer could still have violated MPD policy if he was mistaken about being under actual or threatened lethal attack. The FIT Report concluded that even if Detective McConnell's actions were objectively reasonable, the final two shots "were not fired during an actual or threatened attack," and thus violated MPD policy. *Id.* at 23-24. To the extent this conclusion has any bearing on the constitutional claim, it could hinder, rather than help, appellant's case.

The government further maintains that under District of Columbia law, violations of MPD General Orders are irrelevant to appellant's assault and battery claims, citing *Evans-Reid v. District of Columbia*, 930 A.2d 930, 936 (D.C. 2007); *Karriem v. District of Columbia*, 717 A.2d 317, 322 (D.C. 1998). Appellant offers no argument to the contrary, instead maintaining, without record citation, that during trial the government put the policy violation in issue by denying that it

occurred, but this alleged denial is nowhere to be found in the record on appeal.

To the extent these conclusions in the FIT Report were at all relevant, as appellant contends, the district court still did not abuse its discretion in ruling that this relevance was outweighed by the likelihood of confusing the jury and unfair prejudice to the government. Although as a matter of law the alleged MPD policy violation has no bearing on the Fourth Amendment analysis, it would be far less clear to a jury. One could readily imagine an argument to the jury oversimplifying the matter to suggest that the prior finding of a policy violation was inconsistent with the constitutional defense presented at trial — in fact, appellant makes precisely such an argument on appeal: "[T]heir prior statements are unequivocally inconsistent with the positions that the trial court allowed the District to take in this litigation." Appellant's Br. 31. Even without such prodding, a jury informed of the alleged policy violation and the specific finding that the attack was perceived but not real at the time of the fatal gunshot might assign greater weight to these conclusions — appearing, as they do, in an official MPD report — than the Fourth Amendment analysis allows. The district court could reasonably be concerned that this would cause "big time" confusion of the issues, and preventing such confusion would require the admission of the conclusions to be "hedged about with jury instructions" and necessitate a "trial within a trial about the whole District of Columbia disciplinary system." Tr. Nov. 16, 2009 a.m., at 28. Appellant succeeded in getting substantial evidence before the jury concerning whether the detective's conduct was unreasonable. Considering the tenuous relevance of the excluded portions of the FIT Report, appellant fails to show the district court's line-drawing regarding what portions were inadmissible was an abuse of discretion. *See Brooks v. Chrysler Corp.*, 786 F.2d 1191, 1198 (D.C. Cir. 1986);

*see also Maddox v. Los Angeles*, 792 F.2d 1408, 1418 (9th Cir. 1986).

**III.**

Appellant more persuasively contends that the government violated Rule 26(a)(2) of the Federal Rules of Civil Procedure by failing to supplement its initial expert disclosure to reflect that Dr. Restak had personally interviewed and examined Detective McConnell.

Prior to trial, on October 8, 2009, the government turned over to appellant a September 25, 2009 letter from Dr. Restak as his expert disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2). The letter stated, in pertinent part, that based on Dr. Restak's review of the FIT Report and its attachments, he was of the view that "Detective McConnell was choked and threatened with death," causing temporary hypoxia and partial loss of consciousness, which in turn "would seriously impair his cognitive functioning." At trial, on direct examination, the government did not ask Dr. Restak any case-specific questions, but only general questions based on hypotheticals and also on Detective McConnell's in-court demonstration of Taft's chokehold. Dr. Restak testified that in his opinion the sort of chokehold Detective McConnell demonstrated would likely cause serious cognitive impairment. On cross-examination, appellant asked Dr. Restak to confirm that he had not been asked case-specific questions on direct examination even though he had provided a case-specific opinion in his expert report. Dr. Restak — who quibbled separately with the characterization of his letter as a "report," suggesting it was less formal than that — confirmed that he did have an opinion on what happened here and expressed some surprise that he had not been asked for his opinion during direct examination. On redirect, the government asked for the case-specific opinion, and Dr. Restak explained his

opinion was "along the lines of what I described" generally: the chokehold "interfered with [Detective McConnell's] mentation, his cognitive functioning." Tr. Nov. 17, 2009 p.m., at 122.

On re-cross, appellant inquired as to the basis for Dr. Restak's case-specific opinion. Dr. Restak replied it was based on the FIT Report, the attachments thereto and on his interview and examination of Detective McConnell. Appellant, apparently surprised by the revelation that an in-person interview had taken place, requested Dr. Restak's notes from that meeting, which were turned over, and further ascertained that Dr. Restak did not submit an additional report to government counsel after his meeting with Detective McConnell for production to appellant. Appellant then questioned Dr. Restak at length about the contents of the FIT Report on which he relied for his opinion in the September 25, 2009 report but did not inquire about the interview. The district court sustained the government's objection when appellant began to inquire about the portion of the FIT Report containing Sergeant Gutherie's conclusions. When appellant nonetheless persisted in this line of questioning, the district court excused the jury and held a bench conference. Appellant argued first, that because Dr. Restak had read and relied on the entire FIT Report, appellant should be able to ask about the entire FIT Report, and second, that because Dr. Restak "never issued a report . . . [but was] allowed to testify" and the government had failed to supplement the expert disclosure to reflect Dr. Restak's interview and examination of Detective McConnell, Dr. Restak's testimony should be stricken. *Id.* at 132; *see id.* at 134, 137, 138. The district court denied the motion, ruling that appellant had "waived that" objection, referring to appellant's previous withdrawal of her pretrial objection to the sufficiency of Dr. Restak's initial Rule 26(a)(2) disclosure. *Id.* at 138; *see id.* at 135-36.

When trial resumed, appellant reviewed Dr. Restak's notes on his interview and examination of Detective McConnell, and then asked a series of questions related to Dr. Restak's opinion and credibility, but unrelated to his interview of Detective McConnell. On further re-direct, the government sought to inquire whether, during the interview, Dr. Restak found Detective McConnell to be suffering from an emotional disturbance, as appellant's hypothetical had suggested. The district court *sua sponte* precluded this line of questioning.

Rule 26(a)(2) requires a party to disclose to the other parties six pieces of information concerning an expert witness, including

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

FED. R. CIV. P. 26(a)(2)(B).

Appellant contends the government violated Rule 26(a)(2) in two respects: by failing to make a proper expert disclosure and by failing to supplement the disclosure to reveal the expert's interview and examination of Detective McConnell on which he would rely in testifying at trial. As regards the first, appellant

maintains that, because Dr. Restak considered his letter to be a memorandum to himself, not a formal report, the government failed to make a proper expert disclosure pursuant to Rule 26(a)(2). In the absence of any authority for the premise that the label the expert himself applies to his submission controls the analysis of the sufficiency of a Rule 26(a)(2) disclosure, however, the proper question is whether the disclosure complies with the rule's substantive requirements. In this regard, assuming appellant's first claim of error is not waived because it addresses a different point, the substance of Dr. Restak's testimony plainly fell within the scope of the statement contained in his disclosure, which offered a detailed opinion that Detective McConnell experienced serious cognitive difficulties as a result of being choked and threatened with death. The third paragraph of the report also contains general opinions about the functioning of the brain, both under normal conditions and when frontal and temporal lobes are damaged. Viewed as a whole, the report provides the required "complete statement of all opinions" offered at trial by Dr. Restak. FED. R. CIV. P. 26(a)(2)(B)(i); *see R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 270-71 (6th Cir. 2010).

The government's Rule 26 disclosure fails, however, as appellant contends, to provide the full "basis . . . [and] data or other information considered by the witness" in forming his opinions. FED. R. CIV. P. 26(a)(2)(B)(i)-(ii). At trial, Dr. Restak stated that after submitting his initial report of September 25, 2009 to the government, he interviewed Detective McConnell on October 22, 2009 and this interview was one of the bases for his case-specific expert opinion. Rule 26 requires parties to file a supplemental disclosure reflecting "[a]ny additions or changes" to the required Rule 26(a)(2)(B) disclosures, and thus the government was required to file a supplement reflecting this additional basis for Dr. Restak's opinion. FED. R. CIV. P. 26(e)(2); *see* FED. R. CIV. P. 26(a)(2)(E). Yet no supplement

was ever provided to appellant reflecting that Dr. Restak's testimony would also rely on an in-person interview, a clear violation of this duty to supplement.

The government's response that it did not violate Rule 26's duty to supplement is unpersuasive. Its claim that appellant has forfeited the objection by failing to raise it in a timely manner in the district court is belied by the record, which reflects that while appellant may have waived her pretrial objection to the facial sufficiency of the initial Rule 26(a)(2)(B) disclosure, she promptly objected to the government's failure to supplement the report after she learned of Dr. Restak's interview of Detective McConnell for the first time on re-cross. Its suggestion this court may not reach the issue because the Rule 26(a)(2) report was never made part of the record in the district court relies on *Carter v. George Washington University*, 387 F.3d 872, 877 (D.C. Cir. 2004), which is inapposite. *Carter* concerned a district court's grant of summary judgment based on medical records and other evidence that was not part of the record. Here, although the Rule 26(a)(2) disclosure was never formally filed in the district court, its sufficiency was formally brought into issue during trial and appellant quoted from it at some length when cross-examining Dr. Restak and referred to it repeatedly in making the objection to the district court. Because the disclosure was "treated as part of the record in this case" by the district court, the document is properly part of the record on appeal. *Eureka Investment Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932, 945 n.55 (D.C. Cir. 1984). The government's further suggestion that it was not required to supplement the Rule 26(a)(2) disclosure because it did not elicit Dr. Restak's case-specific opinion on direct examination ignores not only that it produced Dr. Restak's case-specific opinion in the Rule 26(a)(2) disclosure it did make to appellant, but also that it brought out his case-specific opinion on redirect, even if "only out of necessity — to counteract the plaintiff's insinuation during

cross-examination that his unexpressed opinion specific to the case was unfavorable to the defendants," Appellees' Br. 50. Dr. Restak's case-specific opinion was not admitted subject to any limiting instruction, and the government points to no authority for the proposition that an expert opinion elicited on re-direct examination is exempt from the requirements of Rule 26(a)(2). An expert opinion is an expert opinion.

Nonetheless, the district court did not abuse its discretion in declining to strike Dr. Restak's testimony, pursuant to Federal Rule of Civil Procedure 37(c)(1), because the government's failure to supplement its disclosure was harmless, *see id.* As was made clear through re-cross-examination, Dr. Restak had reached his opinion before he had interviewed Detective McConnell and the interview did not change that opinion. Appellant thus suffered no unfair prejudice. Upon learning of the interview during re-cross, appellant received Dr. Restak's notes from his interview of Detective McConnell and reviewed them. Inasmuch as Dr. Restak's opinion was stated in the September 25, 2009 disclosure, appellant's questioning focused on the materials Dr. Restak had reviewed for that opinion and asked no questions concerning the interview. Moreover, assuming sanctionable conduct, the striking of Dr. Restak's entire testimony, as appellant sought, would have imposed a sanction that exceeded the discovery violation. *See Outlet v. New York*, 837 F.2d 587, 591 (2d Cir. 1988); *cf. Webb v. District of Columbia*, 146 F.3d 964, 972 (DC. Cir. 1998). On appeal, appellant does not suggest how the trial proceedings would have been different had there been a timely supplemental disclosure and there is no basis from which to conclude that the Rule 26(a)(2)(E) violation affected appellant's substantial rights. FED. R. CIV. P. 61; *see Whitbeck*, 159 F.3d at 1375.

**IV.**

Appellant's other grounds for reversal of the judgment for the government are unpersuasive.

First, appellant contends that the district court erred in admitting recordings of contemporaneous telephone calls reporting the altercation at the carry-out and requesting assistance — to emergency (911) and non-emergency (311) numbers — because they were irrelevant. Regardless of whether Detective McConnell or Taft "were aware of the contents of the 311 or 911 recordings," Appellant's Br. 52, the recordings provide highly probative contemporaneous eyewitness accounts reflecting the scene that Detective McConnell encountered and the struggle with Taft that ensued. Just as appellant presented live eyewitness testimony at trial to provide accounts of the incident, the government was properly allowed to play these recordings in order to provide other accounts.

Second, to the extent appellant now maintains that the danger of unfair prejudice from playing the recordings outweighed their probative value under Federal Rule of Evidence 403, noting the "yelling and screaming" on the recordings, Appellant's Br. 52, this objection is forfeited because appellant failed to raise it in the district court. *See United States v. Spriggs*, 996 F.2d 320, 325 (D.C. Cir. 1993). Although appellant offers that "the district court cut off Appellant's attempt to be heard on the issue," Appellant's Reply Br. 17-18, the record shows that appellant was cut off only after being afforded ample opportunity to raise a Rule 403 objection. At first, appellant simply lodged the objection without "stating the specific ground of objection" as required by Federal Rule of Evidence 103(a)(1). The district court inquired as to the basis for appellant's objection, and appellant responded, "Relevance

and materiality." Tr. Nov. 17, 2009 a.m., at 49. The district court overruled the objection and, as appellant had already taken two bites at the apple, the district court cut off appellant's attempt at a third. Having afforded appellant a full opportunity to state the basis for the objection, and appellant having referenced neither Rule 403 nor a danger of unfair prejudice, the district court did not abuse its discretion by refusing to hear further argument on the matter.

Third, appellant contends that in these rulings and in two incidents that occurred outside the jury's earshot, the district court judge exhibited such bias as to deny appellant a fair trial. But appellant has not shown that the district court's conduct "reveal[s] such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). The challenged rulings were not an abuse of discretion and demonstrated no such bias. In one incident complained of, the district court called the parties' counsel to the bench and warned government counsel that a line of questioning of its expert witness on police policies and procedures could "open the door" to admission of the FIT Report. Tr. Nov. 17, 2009 p.m., at 154. This guidance appears to have been offered in order to clarify the district court's evidentiary ruling on the FIT Report, and it constituted a sound exercise of discretion, not impermissible bias. In the other incident, while the district court and appellant's counsel were discussing — the transcript suggests somewhat heatedly — the use of the FIT Report in cross-examining Dr. Restak, the district court likened counsel to a church minister due to his perceived inability to modulate his voice. Counsel took exception to the comment, and on appeal appellant suggests it was racially tinged. The record on appeal is bereft of evidence the district court's difficulties with appellant's counsel sprang from any racial attitude or affected its judgments or its conduct before the jury or in any other way deprived appellant of a fair trial.

Accordingly, we affirm the judgment of the district court.